

## CERTIFICATE OF MERIT

1. I, **Yvonne Gomez-Carrion, M.D.**, am a licensed physician and am board-certified in Obstetrics and Gynecology, the same specialty in which Health Care Provider, Richard G. Welch, M.D., is certified, and in which Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., were engaged that gave rise to this claim. I have training and experience in obstetrics in general and more specifically in management of labor and delivery patients in a variety of hospital settings. Additionally, I have extensive experience collaborating and working closely with all members of the labor and delivery team caring for obstetrical patients including physicians and registered nurses and in interpreting fetal monitor tracings, recognizing fetal intolerance to labor and managing the labor and the delivery of routine, high risk and/or otherwise complicated patients, the same area of practice as the Health Care Providers in this claim.

2. I have clinical experience and have provided consultation relating to clinical practice in the area of Obstetrics, the same specialty in which Health Care Provider, Richard G. Welch, M.D., is certified, and in which Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees,

EXHIBIT B

including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., practice within five years of the date of the acts and/or omissions giving rise to this cause of action. I also have clinical experience rendering Obstetrical health care in hospital settings and am familiar with the rendering of Obstetrical related health care under the auspices of medical and hospital corporate structures, the same as Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., were engaged, within five years of the date of the acts and omissions giving rise to this cause of action.

3. Based upon my education, training, and experience, and my review of the medical records pertaining to this claim, it is my opinion to a reasonable degree of medical probability that the care and treatment of Sheena Dorman and her son ▮▮▮▮▮▮ rendered by Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., were negligent and breached the applicable standard of care in at least the following ways: (1) failing to appreciate the risks of delivering a baby that was large for gestational age; (2) failing to arrange for proper support personnel to be present prior to ▮▮▮▮▮'s delivery; (3) failing to counsel Ms. Dorman regarding her delivery options in light of

2

the increased risk that shoulder dystocia would be encountered during the delivery; (4) failing to timely recognize the shoulder dystocia; (5) failing to appropriately and timely perform the necessary maneuvers to correct the shoulder dystocia to safely deliver ▆▆▆; (6) failing to provide appropriate assistance to aid the delivery of ▆▆▆; (7) utilizing excessive downward traction after signs of shoulder dystocia were apparent; and (8) failing to provide the neonatal care providers with accurate information regarding ▆▆▆ delivery.

In my opinion, the standard of care for a patient such as Sheena Dorman and her son ▆▆▆ required any reasonable Health Care Provider, practicing in the same or similar field and under the same or similar circumstances as Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., to properly monitor fetal well being; estimate fetal weight and station; recognize fetal monitor tracings indicative of fetal intolerance to labor; recognize the presence of shoulder dystocia; inform Ms. Dorman of her delivery options; implement appropriate and timely interventions to safely deliver ▆▆▆; and arrange for proper support personnel to be present at delivery to assist.

Had Health Care Providers Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G.

3

Welch, M.D. and Kristen Becker, R.N., complied with the applicable standard of care, it is my opinion to a reasonable degree of medical probability that ▮▮▮▮▮ would have been delivered without sustaining irreversible injury, Erb's Palsy, and other related seqeullae. It is also my opinion to a reasonable degree of medical probability that all of the above mentioned breaches in the standard of care directly and proximately caused ▮▮▮▮▮ to suffer severe, painful, permanent, and disabling injuries, including, but not limited to Erb's Palsy; neurologic injury; cognitive and motor dysfunction; speech and language difficulties; pain, suffering, and mental anguish; diminished enjoyment and quality of life; developmental delays; and other sequellae.

Additionally, it is my opinion to a reasonable degree of medical probability that had Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., complied with the applicable standard of care, ▮▮▮▮▮ ▮▮▮▮▮ severe, painful, permanent and disabling injuries and related sequellae would have been avoided.

4. Attached is a brief report of my opinions, which is incorporated herein by reference. I reserve the right to alter, amend, modify, expand upon or to otherwise revise my opinions as discovery progresses and new or additional information becomes available to me.

5. I do not annually devote more than 20% of my professional activities to activities that directly involve testimony in personal injury claims.

4

6.  I hereby certify and affirm that the above is accurate and true and correct to the best of my ability and based upon my personal knowledge.

_____
Yvonne Gomez-Carrion, M.D.


On this 4 day of Feb, 2015, before me, the undersigned notary public, personally appeared Yvonne Gomez-Carrion, MD and proved to me through satisfactory evidence of identification, which were personal knowledge, to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his/her knowledge and belief.

_____
MARYBETH MESERVEY, Notary Public
My Commission Expires October 31, 2019



RECEIVED
MAR 31 2015
HEALTH CARE
ALTERNATIVE DISPUTE
RESOLUTION OFFICE

## INFORMATION REPORT OF YVONNE GOMEZ-CARRION, M.D.

I have reviewed the pertinent medical records of Sheena Dorman and her son ▮▮▮▮. My opinions contained in my Certificate of Merit are hereby incorporated by reference. I intend to render opinions in the areas of obstetrical standards of care applicable to physicians and nurses managing obstetrical patients, causation, and damages. Upon concluding my review it is my opinion to a reasonable degree of medical probability that the Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., (hereinafter collectively referred to as the "Health Care Providers") deviated from the applicable standard of care by negligently failing to properly manage Ms. Dorman's labor and the delivery of her son ▮▮▮▮. It is further my opinion to a reasonable degree of medical probability that the breaches in the standard of care by the Health Care Providers directly and proximately caused ▮▮▮▮ to severe, painful, permanent, and disabling injuries, including, but not limited to Erb's Palsy and other related sequellae.

My review of the records revealed that Ms. Dorman presented to Anne Arundel Medical Center in active labor on June 29, 2013, at or about 16:24. Ms. Dorman was approximately 37 weeks gestation. An ultrasound taken on or about June 17, 2013, revealed that the estimated fetal weight was at or about the 97th percentile. Ms. Dorman's obstetrical history was significant for a difficult delivery of an 8 lb 13 oz child that necessitated the utilization of forceps. At her last office visit on June 27, 2013, Ms. Dorman's cervix was dilated 3 cm, 50% effaced, and the baby

was at a -3 station. At that time, it was decided that a cesarean section would be scheduled for July 13, 2013.

Shortly after her admission to Anne Arundel Medical Center, a vaginal examination by Dr. Welch found Ms. Dorman's cervix to be dilated 5 cm, 75% effaced, and the fetus remote from delivery at a -3 station. At admission, the fetal heart rate was noted to be reassuring with accelerations and no decelerations, which are signs indicative of a neurologically intact and healthy baby. A note by Dr. Welch indicated that Ms. Dorman had a normal obstetrical history and she was being admitted in active labor with contractions starting at 11:00 that morning. Dr. Welch recorded normal fetal movement and the plan was expectant management. Shortly thereafter Ms. Dorman signed a hospital consent form authorizing the health care providers to perform a vaginal delivery or a cesarean section.

At or about 21:33, Dr. Welch returned to the patient's bedside. A vaginal examination found the cervix to be dilated 5-6 cm. Dr. Welch artificially ruptured the membranes and reported copious clear fluid. At approximately 21:57, it was noted that the anesthesiologist, Dr. Arnab Mukherjee, began the epidural.

At approximately 22:30, a vaginal examination by Kristen Becker, R.N. (hereafter referred to as "RN Becker") found the cervix to be dilated 7 cm. Variable decelerations in the fetal heart rate were also noted at this time. No intrauterine resuscitative measures are noted in the records at this time.

At or about 0:30 on June 30, 2013, RN Becker noted that Ms. Dorman's cervix was dilated 9 cm. Shortly thereafter, approximately 0:30, RN Becker noted that the cervix was completely dilated and that variable decelerations in the fetal heart rate were still occurring. At

2

approximately 1:05, Ms. Dorman began pushing with contractions according to RN Becker. Thereafter, RN Becker noted that variable decelerations were present.

In his delivery note, Dr. Welch writes that, prior to delivery, there was a shoulder dystocia, which occurs when the baby's shoulders get stuck on the maternal pelvis thereby preventing delivery of the body. After 15 minutes of pushing, Dr. Welch notes that he observed a "turtle sign", a classic indication of shoulder dystocia. This phenomenon occurs when the fetal head emerges and then pulls back tight against the perineum. Dr. Welch's note indicates that he then applied downward traction, prior to attempting the McRobert's maneuver. After only minimal descent, the head of the bed was lowered flat and the McRobert's maneuver was performed with traction with successful delivery of the anterior shoulder. Dr. Welch notes that the total time of shoulder dystocia was 30 seconds. Dr. Welch's note contradicts the birth records in claiming that personnel from the Neonatal Intensive Care Unit (hereafter referred to as "NICU") were in attendance.

At approximately 1:18, ▮▮▮▮▮ was delivered weighing 4,810 grams. During the delivery, Ms. Dorman was noted to sustain a second degree laceration. The notes by RN Becker written well after the delivery indicate that ▮▮▮▮ was born with a tight nuchal cord wrapped once around his neck. The notes by the certified registered nurse practitioner responsible for the resuscitation, Donna M. Trageser (hereafter referred to as "CRNP Trageser"), indicate that neonatology was not called until after ▮▮▮▮ was delivered. ▮▮▮▮ had Apgar scores of 4, 7, and 8 at one, five, and ten minutes of life.

The note by CRNP Trageser shows that she was called by a "baby code" alarm after a spontaneous vaginal delivery with tight nuccal cord wrapped once around ▮▮▮▮ neck. The record also shows that the reason to anticipate risk to the newborn was a non-reassuring fetal

3

heart rate pattern. When CRNP Trageser arrived in the delivery room, Brandon was already on the pre-warmed bed and was noted to have poor respiratory effort, hypotonia, and cyanosis. His heart rate was noted to be in the 90s. ███ required aggressive resuscitation, including, but not limited to oral suctioning, tactile stimulation, oropharyngeal suctioning and blow-by oxygen. CRNP Trageser's note contains no evidence that she was informed about the shoulder dystocia and no evidence that she was aware of any brachial plexus injury. Subsequent alterations to the note, made almost seven hours later, added discussion of an injury to ███'s left arm.

███ was admitted to the NICU with a diagnosis of respiratory distress with grunting and continued hypotonia. On July 4, 2013, ███ was discharged from Anne Arundel Medical Center with diagnoses of possible Erb's palsy and respiratory distress syndrome.

It is my opinion to a reasonable degree of medical probability that the standard of care required the Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., managing Ms. Dorman's labor and delivery of her son, to: be familiar with the actions and/or interventions required to achieve the best outcome for mother and baby; accurately determine the estimated fetal weight and station; recognize risk factors that are associated with shoulder dystocia, including, but not limited to a fetus that is large for gestational age and a prior macrosomic baby; advise the patient of the risks of vaginal delivery and the delivery options in light of the increased risks for shoulder dystocia; recognize obstetrical emergencies, including, but not limited to shoulder dystocia; communicate the

presence of a shoulder dystocia to the other health care providers in the delivery room; communicate with the other Health Care Providers; be knowledgeable about the skills and interventions that can be used to timely and safely resolve shoulder dystocia in order to achieve the best outcome for mother and baby; ensure that NICU and/or nursery personnel are present for the birth of a high risk baby; notify nursery personnel about the occurrence of a shoulder dystocia; ensure that at least two nurses are assisting the obstetrician to safely resolve the shoulder dystocia; be knowledgeable about each health care provider's role and be prepared for obstetrical emergencies; routinely practice shoulder dystocia drills; properly perform the maneuvers to correct the shoulder dystocia and deliver the baby without causing further harm; avoid using excessive downward traction; educate health care providers about the identification and management of shoulder dystocia; and establish, follow, and/or enforce appropriate policies, procedures, and/or protocols.

It is further my opinion to a reasonable degree of medical probability that Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., in violation of the standard of care negligently: failed to appropriately consider the obstetrical history; failed to accurately determine the estimated fetal weight and appreciate the risks of shoulder dystocia; failed to failed to communicate concerns about the likelihood of safe vaginal delivery to other health care providers; failed to arrange for NICU and/or nursery personnel to be present at delivery; failed to properly perform maneuvers to

correct the shoulder dystocia without causing harm; utilizing excessive downward traction; failed to appreciate the risks of delivering a baby that was large for gestational age; failed to initiate timely interventions and treatments; failed to expedite the delivery; failed to communicate with the other health care providers; failed to adequately instruct, train, and/or supervise the labor and delivery nurses; failed to establish, follow, and/or enforce appropriate policies, procedures, and/or protocols for obstetrical patients such as Ms. Dorman; failed to act as a patient advocate; and failed to provide information and informed consent to Ms. Dorman.

It is my opinion to a reasonable degree of medical probability that had Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., complied with the standard of care, ▇▇▇▇▇ would have been delivered without sustaining any severe, painful, permanent, and disabling injury, including, but not limited to Erb's Palsy, neurological injuries, and their sequellae.

Therefore, it is my opinion to a reasonable degree of medical probability that Health Care Providers, Richard G. Welch, M.D., individually, and/or Annapolis OB-GYN Associates, P.A., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., and/or Anne Arundel Medical Center, Inc., directly and through their actual and/or apparent agents, principals, servants, and/or employees, including, but not limited to Richard G. Welch, M.D. and Kristen Becker, R.N., breaches in the standard of care as discussed herein and in my Certificate

of Merit, directly and proximately caused ▓▓▓▓▓ to suffer a severe, painful, permanent, and disabling injury, including, but not limited to Erb's Palsy, neurological injuries, and their sequellae.

This report is not, nor is it intended to be, an exhaustive description of all opinions and conclusions, and their bases. My opinions regarding the standard of care and the proximate causation of the injuries, and damages may be modified and/or supplemented upon review of additional information and/or documents.

I further certify that I have had clinical experience, provided consultation relating to clinical practice, and/or taught medicine in the field of Obstetrics or a related field of health care within five (5) years of the date of the above-initiated acts or omissions giving rise to this claim. I also have clinical experience rendering Obstetrical and related health care in hospital settings.

I further certify that I am Board Certified in Obstetrics and/or a related specialty, and/or have taught medicine in that specialty or a related field of health care.

Further, I do not devote more than 20% annually of my professional time on activities that directly involve testimony in personal injury cases.

*Yvonne Gomez-Carrion, M.D.*

On this 4 day of Feb, 2015, before me, the undersigned notary public, personally appeared Yvonne Gomez-Carrion and proved to me through satisfactory evidence of identification, which were personal knowledge to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his/her knowledge and belief

MARYBETH MESERVEY, Notary Public
My Commission Expires October 31, 2019

7